Alan H. SCHAFER and Irving Weisler, Co-Partners Trading and Doing Business as Schafer Distributing Company, Plaintiffs,

v.

MARYLAND CASUALTY COMPANY, a Corporation organized and existing under the laws of the State of Maryland, Defendant.

Civ. No. 3480.

United States District Court
E. D. South Carolina,
Charleston Division.

Sept. 8, 1954.

Barnwell & Whaley, Charleston, S. C., Henry H. Edens, Columbia, S. C., for plaintiffs.

Coming B. Gibbs, Charleston, S. C., for defendant.

WYCHE, District Judge.

This action was brought to recover the sum of $6,000 which the plaintiffs paid to one George Anagnost in settlement of a claim against them, together with the expenses incurred in the defense and settlement of a suit brought by Anagnost against them, as well as damages suffered by the plaintiffs, because of the refusal of the defendant to recognize its obligations under the insurance contract, hereafter set forth. The last item of damages claimed by the plaintiffs was stricken by this Court and, upon the trial of this case, the plaintiffs limited their claim to the amount paid to Anagnost and the expenses incurred by them in the defense and settlement of the suit.

The complaint prayed for the reformation of the policy hereinafter referred to, and thereafter the Court granted plaintiffs' motion to amend the complaint by alleging that the loss suffered by the plaintiffs was covered by the terms of the policy.

At the trial of the case before me, without a jury, the plaintiffs took the position that the insurance policy covered the loss hereafter referred to and that, if it did not cover it, plaintiffs were entitled to have the contract reformed to cover such loss, in accordance with the understanding of the parties when the policy was issued.

The complaint alleged that the plaintiffs were engaged in business as wholesale dealers in bottling wine and distributing beer; that the beer was sold in kegs and that the plaintiffs furnished to their customers steel cylinders charged with carbon dioxide gas for facilitating the drafting of the beer from the kegs; that one Arthur Lazar was the duly authorized agent and representative of the defendant with his place of business in New York City; that the plaintiffs had arranged with Lazar for the obtaining of an insurance policy that would protect them against any liability for property damage and bodily injuries that might be incurred in the operation of their business; that Lazar agreed to insure the plaintiffs against such liability and that such protection would cover claims for damages suffered on the plaintiffs' premises, as well as on premises of plaintiffs' customers, and that it was under this agreement that the plaintiffs obtained insurance policies and paid the necessary premiums therefor.

The complaint further alleges that the defendant issued to the plaintiffs the insurance policy involved in this case and that upon receipt thereof, the plaintiffs placed the same in a place of safe keep-

ing, and that they believed that it had been written by the defendant in accordance with the agreement between the plaintiffs and Lazar.

The complaint further alleges that on or about August 16, 1947, while the said agreement was in full force and effect, the plaintiffs sold and delivered to George Anagnost at his place of business at Folly Island in Charleston County, South Carolina, a keg of beer and that subsequently, in the course of their business, they delivered to him steel cylinders containing carbon dioxide gas to facilitate the drafting of beer out of the kegs; that on August 19, 1947, one of the kegs exploded causing Anagnost to lose one of his eyes and causing him other bodily injuries and that Anagnost brought an action against the plaintiffs to recover the sum of $100,000.

The complaint further alleges that the plaintiffs reported the loss to the defendant who declined liability on the ground that the same was not covered by the policy.

The complaint further alleges that because of the failure and refusal of the defendant to recognize the agreement between the parties, the plaintiffs were compelled to defend the suit brought by Anagnost and were compelled to pay him $6,000 in settlement of the case and to incur expenses in defending the suit, aggregating $3,515.

The amended answer denied that the policy covered the loss referred to in the complaint, and further denied the alleged understanding between the plaintiffs and Lazar. It alleged that the plaintiffs were in possession of the policy for a period of approximately four months before the accident, and that the policy of which the instant policy was a renewal had been in the possession of the plaintiffs for an entire year. The amended answer further alleged that the policy covered accidents occurring on the plaintiffs' premises, and not on the premises of their customers.

In compliance with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A.,

I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

### Findings of Fact.

1. In the years 1946, and 1947, the plaintiff Alan Schafer was engaged in the wholesale distribution of beer in Dillon, South Carolina. In the year 1947, he extended his operations to Charleston, South Carolina, by forming a partnership between himself and the plaintiff Irving Weisler under the name of Schafer & Weisler.

2. During the period from 1942, through 1945, the plaintiff Alan Schafer was in the service and while he was in New York City he met Arthur Lazar, who was in the insurance business, and requested him to write several insurance policies for him.

3. In 1946, Lazar went to Dillon and spent several days there for the purpose of analyzing the plaintiffs' insurance needs and to look into all of the phases of the plaintiffs' operations. The business conducted by the plaintiff Alan Schafer in Dillon, was similar to the type which he set up in Charleston, in 1947, under the partnership of Schafer & Weisler.

4. After Lazar had looked into the operation of Alan Schafer and his needs he recommended a full program to meet all his insurance requirements. Schafer advised Lazar that he wanted liability insurance that would cover all of his operations and any risks that might develop as a result of his operations and that would protect him from liabilities as a result of accidents arising either on his premises or away from his premises on any operations that he had at that time or might acquire in the future and that the policies would cover the plaintiffs' agents or salesmen.

5. Lazar thereupon returned to New York, went to the defendant's office and discussed the risks with the defendant's underwriting employee and, after explaining to him the risk involved, placed

all of the plaintiffs' business with the defendant.

6. In 1946, the defendant issued policy No. 53–048436 and renewed the same in 1947, by policy No. 53059045. It was forwarded by the defendant for counter-signature by its representative in South Carolina; and it was delivered to Lazar who in turn forwarded it to the plaintiffs in South Carolina. All of the premiums were paid by the plaintiffs to the defendant through Lazar, who received his commissions from the defendant. No compensation was received by Lazar from the plaintiffs.

7. The premiums paid by the plaintiffs to the defendant through Lazar amounted to $6,000 or $7,000 annually.

8. Plaintiff Alan Schafer received about a half dozen policies in the mail, went over them briefly, looked at them to see that they were the type of policy that he and Lazar had agreed on. He did not go into the fine print or all of the details. He kept the policies in a safe in his office.

9. The plaintiffs were engaged in business as wholesale dealers in bottling wine and distributing beer, selling the beer in kegs and furnishing their customers at their respective premises, steel cylinders charged with carbon dioxide gas for facilitating the drafting of beer from the kegs.

10. Upon receipt of a complaint from George Anagnost, the plaintiff Irving Weisler instructed one of the plaintiffs' salesmen to install a tube of gas at the premises of Anagnost. Several hours later he received another call that the equipment was not functioning because it lacked gas. The plaintiff Weisler thereupon sent the salesman back to Anagnost's with a pick-up truck to furnish him with another tube of gas. Upon receipt of another complaint the plaintiff Weisler went himself to Anagnost's place of business, took with him a one-half filled tube of gas and attached it to Anagost's equipment. He installed another regulator valve, worked on it for some time, adjusted it and told Anagnost not to touch it, but that he, Weisler,

would come back the following morning and look at the equipment. Before Weisler could return the following morning he received a call that an explosion had occurred at Anagnost's place of business. Weisler had not completed the installation the night before the explosion.

11. As a result of the explosion of one of the kegs of beer Anagnost suffered bodily injuries, lost his right eye and brought suit against the plaintiffs and the Red Top Brewing Company for $100,000.

12. Weisler telephoned Lazar and advised him of the accident. Lazar told him not to worry, that the plaintiffs were amply covered by the insurance and that he would make a report to the defendant. Weisler was instructed, in the event that he received a summons and complaint to turn the same over to the defendant's agent in Columbia. Weisler located the manager of the defendant's Columbia office, offered him the summons and complaint and the manager refused to accept the same. When Lazar learned more than a year afterwards that the defendant had denied liability he was terribly upset and shocked because it was his opinion that the accident was covered by the policy and that the defendant should defend the suit.

13. Upon the denial of liability by the defendant and its refusal to defend the action brought by Anagnost, plaintiffs employed attorneys who defended the suit.

14. The suit was instituted on the 3rd day of November, 1948, but never came to trial. The defendant Red Top Brewing Company made settlement with Anagnost and executed a covenant not to sue, and the plaintiffs' attorneys negotiated for a settlement, and the plaintiffs paid to Anagnost $6,000 on the 25th day of March, 1952. An order discontinuing the action, consented to by the attorneys for the plaintiffs and the attorneys for Anagnost, was entered on March 27, 1952.

15. The plaintiffs paid attorneys' fees for defending the Anagnost suit and in effecting a settlement, aggregating the

sum of $2,250 and incurred expenses in connection with the investigation, expert advice, travel, etc., amounting to approximately $1,365.

16. Lazar was acting as the agent of the defendant in all the acts done by him in connection with the sale and delivery of the insurance policy to the plaintiffs.

### Conclusions of Law, Opinion and Order.

Jurisdiction is conferred upon this Court because of diversity of citizenship.

At the trial the following questions were raised:

1. Did the policy cover the accident referred to in the complaint?

2. If it did not cover it, should it be reformed so as to cover the same?

3. Was Lazar the agent of the defendant under the laws of South Carolina?

At the close of plaintiffs' case the defendant moved for judgment in its favor, contending that the policy did not cover the instant loss and that the plaintiffs were not entitled to have it reformed. The defendant further contended, although it did not plead it in the answer, that under Paragraph 12 of the Conditions of the policy, this action did not lie because the plaintiffs' obligation to Anagnost had not been finally determined either by judgment against them after trial or by written agreement of the plaintiffs and Anagnost and the defendant.

In the case of Eaves v. Progressive Fire Ins. Co., 1950, 217 S.C. 365, 60 S.E. 2d 687, at page 688, the South Carolina Supreme Court said: "Where the language of an insurance contract may be understood in more senses than one, or where it is doubtful whether the given words were used in an enlarged or restricted sense, other things being equal, that construction should be adopted which is most beneficial to the insured and construed most strongly against the insurer."

The policy in the instant case provides for the payment "on behalf of the insured the sums which the insured shall become obligated to pay * * * caused by accident and arising out of the hazards hereinafter defined." The "hazards" cover—"1. Premises-Operations Bottling Wine Clerical Office Employees Salesmen, Outside" The hazards are defined as follows: "Division 1. Permises-Operations. (1) The ownership, maintenance or use of the designated premises, and all operations which are necessary or incidental thereto, or (2) The maintenance or use of alienated premises as defined herein. * * *

"Division 3. Products. (1) The handling or use of, the existence of any condition in or a warranty of goods or products manufactured, sold, handled, or distributed by the named insured, other than equipment rented to or located for use of others but not sold, if the accident occurs after the insured has relinquished possession thereof to others and away from premises owned, rented or controlled by the insured or on premises for which the classification stated in section 1 of Item 3 of the declarations or in the company's manual excludes any part of the foregoing, or (2) operations covered under division 1 or 5 of the Definition of Hazards, if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof and away from premises owned, rented or controlled by the insured, except (a) pick-up and delivery, (b) the existence of tools, uninstalled equipment and abandoned or unused materials and (c) operations for which the classification stated in section 1 of Item 3 of the declarations or in the company's manual specifically includes completed operations; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement."

It appears from the evidence that the plaintiff Weisler was selling beer to

878

Anagnost; that in connection the sale of his products he undertook to install a regulator on the equipment at the premises of Anagnost; that the "operations" had not been completed, and that when Weisler left he told Anagnost not to touch the regulator which he had installed and that he would come back the following morning and look at the equipment. I am of the opinion, therefore, that inasmuch as the policy provided that the completed operations shall be covered by Division 3 under the title "Products", the incompleted operations were covered under Division 1 entitled "Operations". The policy recites that the insurance covers the risks specified in Subdivision 1, and I am of the opinion that the risk in the instant case was covered under that Subdivision.

■ Assuming, however, that the policy does not cover the instant loss, I am of the opinion that the plaintiff is entitled to have it reformed so as to cover it, and

It is hereby ordered that the policy be reformed accordingly.

Lazar testified that when he had arranged for obtaining insurance for Schafer he was told by him that he wanted "liability insurance that would protect him from liabilities as a result of accidents arising either on his premises or away from his premises on any operations that he had at that time or might acquire in the future"; that he requested insurance for "all of his operations and any risks that might develop as a result of his operations". He further testified that he procured all of the policies for the plaintiffs from the defendant after taking it up with the underwriter employed by it and explaining to him the risks involved.

Section 12–703 of the Code of Laws of South Carolina, 1952, provides: "Contracts with citizens deemed made in State. It shall be a further condition precedent to the right of any foreign corporation to do business in this State that it shall be taken and deemed to be the fact irrebuttable and part and parcel of all contracts entered into between such corporation and a citizen or corporation of this State that the taking or receiving from any citizen or corporation of this State of any charge, fee, payment, toll, impost, premium or other moneyed or valuable consideration under or in performance of any such contract or of any condition of the same shall constitute the doing of its corporate business within this State and that the place of the making and of the performance of such contract shall be deemed and held to be within this State, anything contained in such contract or any rules or bylaws of such corporation to the contrary notwithstanding."

Section 37–141, Code of Laws of South Carolina, 1952, provides: "All contracts of insurance on property, lives or interests in this State shall be deemed to be made therein and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof."

Section 37–233, Code of Laws of South Carolina, 1952, provides: "Any person who (a) solicits insurance in behalf of any insurance company, (b) takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, (c) advertises or otherwise gives notice that he will receive or transmit any such application or policy, (d) shall receive or deliver a policy of insurance of any such company, * * * (f) shall receive, collect or transmit any premium of insurance, * * * (h) shall do or perform any other act or thing in the making or the consummating of any contract of insurance for or with any such company, other than for himself, * * * shall be held to be acting as the agent of such insurance company for which such act is done or risk is taken."

In the case of Maryland Casualty Co. v. Gaffney Manufacturing Co., 93 S.C. 406, 76 S.E. 1089, 1091, the South Carolina Supreme Court held that Walter Brem who had an agency in Charlotte, North Carolina, and could not write the policy in his own company and brokered

it to the Southern States Trust Company, must be held to have been the agent of the insurance company and that his knowledge must be imputed to it. The Supreme Court referring to the statute, which is now Section 37-233 of the South Carolina Code, said: "Under the statute quoted, Mr. Brem, who brokered the policy to the plaintiff, must be held to have been the plaintiff's agent, and his knowledge must be imputed to the plaintiff. He testified that he knew the facts and circumstances hereinbefore stated, and that it was intended that the policy should cover only the employes of the finishing plant."

Assuming, however, that Lazar was not the agent of the defendant, I am still of the opinion that the policy should be reformed, if it needs reformation, inasmuch as the evidence is undisputed that Lazar explained to the underwriter employed by the defendant the risks which Schafer wanted covered and those risks were intended to cover the injuries sustained by Anagnost.

The defendant's amended answer alleges that the plaintiffs had ample opportunity to read and inspect the policies and to notify the defendant if they considered that the same did not afford the coverage which the plaintiffs believed they had purchased. In the case of Kaiser v. Carolina Life Ins. Co., 219 S.C. 456, 65 S.E.2d 865 at page 870, the South Carolina Supreme Court said: "'Error is assigned because of the following charge given by the judge to the jury: "The fact that an insured person accepts a policy of fire insurance without noticing a mistake does not preclude him from having the mistake corrected, even though he fails to read the policy over or carelessly reads it." It is contended that the foregoing instruction embodied a charge on the facts. The language quoted is substantially a direct quotation from the opinion in the case of Central Ice Cream & Candy Co. v. Home Ins. Co., 171 S.C. 162, 171 S.E. 797.'

"In the cited case of Central Ice Cream & Candy Co. v. Home Insurance Co. the well-prepared trial decree was affirmed and published as the opinion of this court. Reformation was granted with respect to a fire insurance policy. The following is a presently pertinent excerpt from the opinion: 'As to whether or not the plaintiff should be denied the relief sought by reason of its not having read the policy, I think that the general rule in regard to this proposition is clearly stated in the case of Delaware Ins. Co. v. Hill (Tex.Civ.App.) 127 S.W. 283, also cited with approval in the case of Dickenson County Bank v. Royal Exchange Assur., 157 Va. 94, 160 S.E. 13, 76 A.L.R. (1209) 1216: "Since, if assured accepts a policy without dissent, it is presumed he knows its contents, the burden is on him, in a proceeding to reform it for a mistake, to prove that he did not know its contents when it was accepted, as by showing that when he received it he put it away without inspection, or that he relied on the insurer's knowledge and supposed he had drawn it correctly."' (171 S.C. 162, 171 S.E. 798.)"

The Court further said in 65 S.E.2d at page 869: "It is inconsistent and inequitable for appellant to plead the negligence of respondent in failure to discover its (appellant's) mistake, under the facts of this case. 'When one party, by mistake, prepares an instrument incorrectly, he may not urge in bar of reformation that the other party read it so carelessly as not to detect the error. Los Angeles & R. R. Co. v. New Liverpool Salt Co., 1906, 150 Cal. 21, 87 P. 1029; California Packing Corp. v. Larsen, 1921, 187 Cal. 610, 203 P. 102.'"

The plaintiff Schafer testified that he received probably a half-dozen policies in the mail; that he went over them briefly, looked at them to see whether they were the type policies "we had agreed on"; that he did not go into the fine print or all of the details, and he assumed that the plaintiffs were covered. Schafer can hardly be criticized for not concluding that the instant policy covered the injuries sustained by Anagnost inasmuch as Lazar, an insurance broker

880

of many years' experience, when he was advised by Weisler of the accident, told him that he was covered under the policy and not to be concerned about it and that he would immediately forward the information to the defendant.

In moving for judgment for the defendant, counsel referred to Section 12 of the Conditions of the policy which reads as follows: "12. Action Against Company. No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the company as a co-defendant in any action against the insured to determine the insured's liability. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder."

■ I am of the opinion that that section refers to actions brought by the injured party and not by the insured. The section refers to a judgment obtained after actual trial or by written agreement of the insured, the claimant and the company. It then provides that a person who has secured "such judgment or written agreement" shall be entitled to recover to the extent of the injuries afforded by the policy. The section further provides that bankruptcy or insolvency of the insured shall not relieve the company of its obligations.

■ It would be unreasonable to hold that the insured would have no claim against the company if it refuses to defend an action brought by an injured person against the insured, or to recog-

nize any liability under the policy, until a judgment is recovered after actual trial. It would be unreasonable to require that a person who is sued would have no right to try to settle his case without going to trial and to take the risk of the plaintiff securing a large judgment against him. This case is a fair example. The plaintiffs were sued for $100,000. They settled for the reasonable sum of $6,000, after the case was pending for a long time. Can it be said that they cannot recover the reasonable amount paid by them because they should have insisted on trying the case and taking the risk of having a $100,000 judgment recovered against them, particularly, when, in any event, they could only get $10,000 from the defendant under this policy? The alternative requirement of Section 12 is that there must be a written agreement between the insured, the claimant, and the company. Of course, it would have been idle to have asked the company to join in a written agreement to pay any money when it denied liability.

If it was the intention of the defendant that the action referred to in Section 12 should apply to the insured, the defendant would have so stated in its policy. In the case of Great American Indem. Co. of New York v. Saltzman, 8 Cir., 213 F.2d 743, at page 746, the Court said: "In Arkansas as in most jurisdictions it is held that as insurance contracts are phrased by the insurer it is incumbent upon the insurer to make them so clear that they contain no ambiguity as to their meaning or they must be construed most strongly against the insurer."

The plaintiffs paid $2,150 to their attorneys for defending the suit and negotiating the settlement and have also paid approximately $1,365 in investigations, expert advice, travel, etc.

■ I have concluded that $1,750 is reasonable compensation for the attorneys and that the sum of $750 should be allowed to the plaintiffs for the amounts expended by them for investigations, expert advice, travel, etc.

It is ordered that the plaintiffs have judgment against the defendant in the sum of $6,000, with interest thereon from the 25th day of March, 1952, together with the further sum of $1,750, attorneys fees, and $750, expenses.